UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Docket No.: 1:17CR00195-002 |
| | ) | |
| HOPE R. CARBONE  and | ) | |
| | ) | |
| DONNA VENTURINI | ) | |

**Donna Venturini's and Hope Carbone's Memorandum in Aid of
Sentencing and Objection to Presentence Report**

Donna Venturini and Hope Carbone,[1] by and through undersigned counsel, file

their Memorandum in Aid of Sentencing and Objection to the PSR as follows:

**Facts of the Case**

Hope Carbone and Donna Venturini (sisters) were each half owners of D&H

Marketing, Inc. ("D&H") which was established as a Pennsylvania S corporation on

January 22, 2007.  In 2009, D&H applied for and received a tobacco import permit from

the U.S. Alcohol and Tobacco Tax and Trade Bureau ("TTB").[2]  (I-23).  This was

accomplished with the help of Richie Arslanian, Hope and Donna's brother-in-law, who

had a long-standing relationship with the co-defendant, Jose Dominguez.  Donna and Hope

did not know Dominguez prior to Arslanian introducing them.

The company was formed by Arslanian and his attorney.  Arslanian established the

original corporate registered office at his home address.  The address was not changed to

Donna and Hope's address for a year and a half.  (September 2008).

---

[1] Donna and Hope file this combined memorandum since their cases and backgrounds are
virtually identical.

[2] References to the information filed by the government in this case will be referenced as (I-#).

After D&H received its tobacco import permit, Hope and Donna agreed with Arslanian and Dominguez to import Victor Sinclair cigars manufactured by Dominguez in the Dominican Republic. (I-21).    Prior to 2009, Hope and Donna had not been involved in the importation of any type of merchandise into the United States and Dominguez knew they had no training, education, and experience in the importation of tobacco products. (I-22).  In fact, neither Donna nor Hope had even completed high school.

Prior to doing business with Hope and Donna, Dominguez, with the help of Arslanian, was selling Victor Sinclair cigars in the United States through Southern Smokers, LLC of Atlanta, Georgia.  After a falling out with the owner of Southern Smokers, Dominguez and Arslanaian decided D&H should be the importer of the Victor Sinclair cigars.  The idea was for D&H to sell the cigars to the same accounts that were already buying Victor Sinclair cigars from Southern Smokers.  Dominguez had a long-standing business relationship with all of these accounts.  (I-24).

In order to maintain control over the transactions, Dominguez arranged for his custom's broker, Global Distribution & Logistics, LLC ("GDL") with offices in Illinois to assist D&H in importing the product.  Neither Donna nor Hope knew of or ever did business with GDL before Jose arranged for GDL to act as D&H's customs broker.  No one at D&H ever met anyone from GDL and virtually the only contact D&H had with GDL was by email when GDL told D&H what FETs to pay.

GDL calculated the Federal Excise Taxes ("FETs") due for each shipment of cigars based on the invoices provided to them by Dominguez, completed and submitted the entry summaries to Customs (CBP Form 7501), notified D&H as to how much D&H should send GDL to cover the FETs, received this payment from D&H, and then paid the calculated

FETs to Customs on behalf of D&H.  (I-25).  Notwithstanding Dominguez's total control of this arrangement, Hope and Donna understand that D&H, as the importer of record, was legally responsible for paying the proper FETs.

With each shipment, Dominguez sent Hope and Donna a commercial invoice that did not include the Victor Sinclair's sales price to D&H but rather referenced the sales price D&H was to use when invoicing Dominguez's accounts.  Each invoice had a separate column for FETs which Dominguez calculated and placed on the invoices.  The FET Dominguez placed on the invoice was the correct FET calculation based on the first sale occurring in the United States.  (I-37).  This is what the law required.   The prices on the invoices (including the FET calculation) were the prices Dominguez negotiated directly with his customers.   Neither Donna nor Hope had any prior relationship with any of these customers and had minimal contacts with them throughout their relationship with Dominguez.   Moreover, D&H had no involvement in establishing the sales prices or calculating the FETs to be invoiced and paid.  (I-35, 36, 37).  Hope and Donna trusted and assumed that Dominguez was doing it properly.

Upon receiving an invoice from Dominguez, Hope and Donna changed the company name on the top of the invoice they received from Victor Sinclair to D&H (they made no other changes to the invoice) and passed them on to the customers.   These accounts received the goods and paid D& H, who deposited all the proceeds into the D&H bank account.  (I-39, 40).  All the proceeds deposited into this account were booked as income and appropriate income taxes were paid on all these proceeds. When the goods arrived in the United States, they were placed in the Dimar International Cargo ("Dimar") warehouse in Miami, Florida.  This warehouse was selected by Dominguez.  Upon clearing

Customs, the goods were shipped directly from Dimar to the customers identified and selected by Dominguez. D&H never saw or had physical possession of these goods. The Dimar warehouse bills were paid by D&H from the D&H bank account.

Unbeknownst to Hope and Donna, Dominguez was also sending different (fraudulent) commercial invoices directly to GDL with lower first sale prices than what was actually being billed to and being paid by the customers. (I-38). Hope and Donna never received copies of these invoices.[3]

Based on the fraudulent invoices Dominguez provided to GDL, GDL calculated the FETs due the government (I-31) and emailed a payment request to D&H for this amount. This resulted in FETs that were substantially under-reported and under-paid. (I-38, 42).

Upon receipt of the payment information, D&H paid exactly the amount of FETs GDL calculated was due. In addition, D&H paid Dominguez for the cigars and paid all its other related corporate expenses from the D&H bank account. All of these payments were booked as expenses on their Federal income tax returns.

The difference between the FETs paid by Dominguez's customers and the FETs paid to GDL (and to the government) remained in the D&H bank account. Other than taking a reasonable draw and paying reasonable expenses, Hope and Donna did not withdraw this money for their personal use or use it to live an extravagant lifestyle. On a number of occasions, Dominguez demanded Donna and Hope pay him what he called "loans" from this account, although there was never any attempt to repay these proceeds. The "loans" paid to Dominguez were approximately $900,000.00 of the $1,806,772.00 in underpaid taxes. (I-42). This substantially depleted the D&H bank account. The

---

[3] Please note that the failure of D&H to have and maintain these documents was cited by TTB as a deficiency in its audit report dated March 10, 2011.

$900,000.00 paid to Dominguez was booked as an expense by D&H's accountant when calculating Federal income taxes.  The balance remaining in the account was considered profits and the appropriate income taxes were paid on this amount.

Although Hope and Donna did not have direct knowledge of what Dominguez was doing, there were enough red-flags that they should have been aware that something was amiss.  They admitted -- and take responsibility for -- the fact that they possessed documents which showed that the amount of FETs they were billing the customers and the amount they were paying GDL was substantially different.  The amount claimed by the government as the tax loss in this case is the difference between the FET's billed and paid by the customers and the FET's paid by D&H as calculated by the customs broker.  Donna and Hope did not reconcile these documents or the amounts being paid but they should have.  They acknowledge that they were willfully blind to these facts.

As evidence of the fact that Hope and Donna did not have actual knowledge of the fraud, when TTB audited D&H, Donna and Hope provided TTB with the only invoices they had which were the invoices they sent to Dominguez's customers.  It was the fact that the FETs on these invoices were different from the FETs reported and paid to Customs that alerted TTB to the fraud.  One does not usually, knowingly, and voluntarily provide the government with the "smoking gun" that establishes one's own fraudulent conduct.  At the time they provided the documents, Hope and Donna had no idea there were a second set of invoices or that there were any problems with the FET payments.  They should have known, but they did not.

All the funds Hope and Donna received from customers, which included the excess FETs, were reported on their income tax returns as income and they paid the appropriate personal income taxes on all amounts taken as income.

### Probation's Guideline Calculation

The Presentence Investigation Report ("PSR") states in pertinent part:

- Guideline Provisions: "Based upon a total offense level of 19 and a criminal history category of I, the guideline imprisonment range is 30 to 37 months according to the Sentencing Table in Chapter 5, Part A."  PSR ¶ 49.

Counsel requested that the probation office recommend an additional two level reduction from the total offense level since Donna and Hope are minor participants in this case. USSG § 3B1.2.  The probation officers for both defendants refused counsel's request and we therefore ask the court to resolve this issue.

### Donna and Hope Were Minor Participants in this Matter and are Entitled to an Additional Two Level Reduction

Donna and Hope were minor participants in this matter given that their involvement, knowledge and culpability was materially less than that of Dominguez, the architect and main perpetrator of this scheme. USSG § 3B1.2 provides for a two-level reduction in offense level where " 'the defendant was a minor participant in any criminal activity' [such that] the adjustment applies to a defendant 'who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal.' " *United States v. Pierre*, 825 F.3d 1183, 1196 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 698 (2017), *reh'g denied*, 137 S. Ct. 1617 (2017), *quoting* USSG § 3B1.2, comment (n.5).  In the Third Circuit, the minor role adjustment applies if the defendant shows that his or her " involvement, knowledge and culpability were materially less than those of other participants" and not merely that other participants in the scheme may have been more

6

culpable. *United States v. Brown*, 250 F.3d 811, 819 (3d Cir. 2001), *quoting United States v. Headley*, 923 F.2d 1079, 1084 (3d Cir. 1991). Of course, such a determination "is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." *Pierre*, 825 F.3d at 1196, *quoting* USSG § 3B1.2, comment (n.3(C)).

The Third Circuit "look[s] to certain factors to determine whether a defendant is entitled to a reduction for a minor role under § 3B1.2." *United States v. Aquil*, 654 Fed. Appx. 574, 577 (3d Cir. 2016). "These factors are "(1) the defendant's awareness of the nature and scope of the criminal enterprise; (2) the nature of the defendant's relationship to the other participants; and (3) the importance of the defendant's actions to the success of the venture. The District Court should consider each of these factors in relation to the other participants in the conspiracy." " *Aquil*, 654 Fed. Appx. at 577, *quoting Brown*, 250 F.3d at 819 (quoting *Headley*, 923 F.2d at 1084 (*quoting United States v. Garcia*, 920 F.2d 153, 155 (2d Cir. 1990))) (other citation omitted). Moreover, "[i]n 2015, the Sentencing Commission amended § 3B1.2's commentary to provide additional guidance regarding the minor role reduction." *United States v. Presendieu*, 880 F.3d 1228, 1249–50 (11th Cir. 2018), *citing* U.S.S.G. supp. to app. C, amend. 794 (Reason for Amendment).

> Amendment 794 provides a non-exhaustive list of factors to be considered when determining whether a defendant qualifies for a minor role reduction: (1) "the degree to which the defendant understood the scope and structure of the criminal activity;" (2) "the degree to which the defendant participated in planning or organizing the criminal activity;" (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;" (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;" and (5) "the degree to which the defendant stood to benefit from the criminal activity."

*Presendieu*, 880 F.3d at 1249–50, *quoting* U.S.S.G. § 3B.1.2 cmt. n.3(C) (2015).

Consideration of these factors is critical here, as is consideration of the additional benchmark provided in the commentary to § 3B1.2, which states that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." (emphasis added) U.S.S.G. § 3B1.2 cmt n.3(C) (2015).  Notably, this is different than the proscription by the Third Circuit that minor role reduction is not afforded where a defendant is merely less culpable than his or her co-defendants "because there are varying degrees of culpability present in virtually every criminal conspiracy." *Brown*, 250 F.3d at 819.

Donna and Hope have accepted responsibility in this matter for their willful blindness to Dominguez's scheme and for the part they played in enabling this scheme to succeed.  However, Dominguez was inarguably the designer and leader of the scheme and neither Donna nor Hope had any prior experience, skill, training, or other exposure to the importation business, cigars or otherwise.  Dominguez set up D&H's business, procured the import license, furnished the customers and the product, negotiated all the prices and terms with the customers D&H sold to, selected the Customs broker and the warehouse used in the scheme, calculated the FETs and prepared the invoices sent to the customers with the correct FETs calculated, and calculated and prepared the false invoices provided to G.L. upon which the underpaid FET was calculated.  Thus, Donna and Hope had very little actual awareness of the nature and scope of the criminal enterprise set up and promulgated by Dominguez.  Further, unlike the defendant in Brown, infra, the nature of

Donna's and Hope's relationship to Dominguez was essentially that of being set up as figureheads for Dominguez's scheme rather than intimately involved in the active development of that scheme.

In addition, Dominguez took approximately $900,000.00 of the excess proceeds by the time Donna and Hope stopped acting as the importer of record in January 2012. Please note that Dominguez was engaged in this scheme before Donna and Hope were ever involved and he continued the scheme after they stopped importing his products. (I-47).

Unlike Donna and Hope in this case, the defendant in *Brown, supra,* was not a minor participant where "Brown presented the nature of the scheme to her cousin Latasha Green … [and] explained that [co-conspirator] Jordan promised to pay $100.00 for Green's participation." *Brown,* 250 F.3d at 819–20. Green agreed and served "as a straw-purchaser." *Id.* at 820. Additionally, "Brown admitted she was present when Jordan collected Green to make the straw purchase as well as when she returned. Brown also admitted hearing Jordan instruct Green to report that the guns she had purchased for him had been stolen. Thus, Brown initiated Green's recruitment and knew that the purpose of the scheme was to procure untraceable firearms." *Id.* Plainly, then, "Brown's claim that she was "the least culpable defendant" ignores the obvious: she was responsible for the recruitment of Green, was essential to the acquisition of firearms, and knew that Jordan planned to remove the guns' serial numbers, making them untraceable, and have her report them as stolen." *Id.* No such comparable facts exist in this case.

Dominguez used Donna and Hope in carrying out this scheme. While Donna and Hope accept that their willful blindness to Dominguez's scheme aided in the success of that scheme for a time, the relative importance of the Donna's and Hope's actions to the success

of the Dominguez's venture was nominal.  Donna and Hope, through the business (D&H)

Dominguez engineered and set up for them, merely served as the "permitted domestic

importer" Dominguez needed to sell his foreign-manufactured cigars in the U.S. as part of

his scheme – a scheme of which Donna and Hope were absolutely unaware initially and

about which they had no actual knowledge (notwithstanding their admitted subsequent

willful blindness).  Plainly, Donna's and Hope's involvement, knowledge, and culpability

was materially less than that of Dominguez.  Being unsophisticated as they were, they did

not have a high degree of understanding as to the scope and structure of Dominguez's

criminal enterprise.  They did not participate in planning or organizing Dominguez's

criminal enterprise – which was already in place before Donna and Hope became involved

and continued after they surrendered their import license.  They did not exercise or

influence the exercise of decision-making authority, but instead followed Dominguez's

'directions' about the products, licenses, customers, prices, brokers, warehouses, FETs, and

invoices.  In enabling Dominguez's scheme to succeed, such as sending on the invoices

Dominguez prepared, they performed very few acts independently.  Lastly, Donna's and

Hope's only gain from the scheme was the increased profit to D&H and the increased

personal income – on which they faithfully paid income taxes.  In short, Donna's and Hope's

involvement, knowledge, and culpability were materially less than Dominguez's.[4]  For

---

[4] In *Pierre*, contrastingly, the court declined to apply the minor role sentence reduction because
both defendants knowingly and actively procured false information to obtain fraudulent credit
cards, which they then used for personal gain, filed false tax returns, and leased office space for
sham businesses.  825 F.3d at 1197.

these reasons, Donna and Hope are entitled to a minor role sentence reduction under § 3B1.2.[5]

The unique circumstances of this case, particularly as they apply to Donna's and Hope's comparatively minor role, support the exercise of this Court's sound discretion in deviating from the non-mandatory sentencing guidelines. *See e.g., United States v. Booker*, 543 U.S. 220, 249 (2005) (severing and excising provisions of Federal Sentencing Act that made guidelines mandatory and set forth standard of review on appeal).

### Donna's and Hope's Cooperation with the Government

It is anticipated that the government will file 5K1.1 downward departure motions on behalf of both Donna and Hope. In those motions, the government will detail the cooperation both women provided and its importance to the government. Given that such motion will not be filed for some time, however, a brief overview is appropriate.

Immediately upon being informed that they were the focus of the instant investigation, Donna and Hope – through counsel – contacted the government and offered their cooperation. They met with the prosecutors and agents on two occasions and were debriefed for several hours each time as to their knowledge in this matter. Donna and Hope were candid and truthful throughout their debriefings, including admitting their own

---

[5] The probation office supports its recommendation against minor role reductions for Donna and Hope, in part, because "[t]he government advised that these two defendants continued to participate in this fraud scheme after a routine audit revealed that they were keeping two sets of books." This simply is factually inaccurate. Once the auditors told Donna and Hope that there was a discrepancy between their invoices and those of the customs broker, a fact of which they were totally unaware, they immediately gave up their import license and stopped importing cigars for Dominguez. Moreover, while two sets of invoices apparently existed (the accurate set maintained by D&H, and the fraudulent set kept by the customs broker), it is undisputed that Donna and Hope never received or saw the set provided to, and kept by, the customs broker. Donna and Hope never kept two sets of books.

complicity, identifying and explaining relevant documents, and furnishing the government with all of the details of which they were aware.  They agreed to testify as government witnesses, both before the grand jury and at trial.[6]

## Federal Sentencing Framework Post-Booker and Section 3553 (a) Factors

As this Court is aware, in Booker, the U.S. Supreme Court severed the mandatory provisions from the Federal Sentencing Act, thus making the Guidelines effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553(a): "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." Booker, 543 U.S. at 261. Title 18 U.S.C. § 3553(a) provides in pertinent part:

> Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

---

[6] Despite their offer to testify before the grand jury, the government decided that Donna's and Hope's testimony was unnecessary at that juncture.  Nevertheless, the government has notified counsel that it does wish to use Donna's and Hope's testimony at the trial of Jose Dominguez following his extradition to the United States.

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established ....

(5) any pertinent policy statement...

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

(Emphasis added.)

In *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 169 L.Ed.2d 445 (2007), the Supreme Court outlined a step-by-step approach to sentencing post-Booker, starting with the Guidelines: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. However, the Supreme Court pointed out that, "The Guidelines are not the only consideration[.]" *Id.* The next step for the District Court should be to allow both parties "an opportunity to argue for whatever sentence they deem appropriate," and "then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In doing so, the District Court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. The Supreme Court pointed out that the District Court "must make an individualized assessment based on the facts presented." *Id.* The Supreme Court reminded the District Court that:

If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it

> uncontroversial that a major departure should be supported by a more significant justification than a minor one.

*Id.* The last step in the process would be the explanation: "After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.*

In this case, several § 3553(a) factors militate in favor of a downward variance from the guideline sentence. For example, while not downplaying the seriousness of the offense to which Donna and Hope pled guilty, it is mitigated in significant degree by their immediate acceptance of responsibility and cooperation with the government. Because the law encourages sentencing reductions based on cooperation, a reduction below the current guideline level will not reduce "respect for the law." 18 U.S.C. § 3553(a)(2)(A). And, given the probability that some component of incarceration may be imposed, a lesser sentence will continue to "afford adequate deterrence," while at the same time continuing to promote cooperation with the government. *Id.* at § 3553(a)(2)(B).

Nor is it likely that Donna and Hope will ever repeat their mistake. As both the PSR and the letters written to the court attest, with the exception of this offense, both defendants' entire background are as law abiding citizens. The instant offense represents a marked deviation from both defendants' otherwise law-abiding lifestyle. When the TTB audit disclosed to D&H the nature of the fraud, D&H voluntarily cancelled their TTB importers permit and returned it to TTB. Since they no longer have an import license, neither Donna nor Hope can import tobacco products and therefore cannot reoffend. As such, we submit that the public needs no protection from further crimes. *Id.* at § 3553(a)(1)

and (2)(C).[7]  In addition, because the court is no longer bound by the sentencing guidelines, the types of sentences available have little significance.  *Id.* at § 3553(a)(3).  Moreover, because there is no strict yardstick by which sentences are imposed in the cases of cooperating individuals, a greater reduction will not cause a sentencing disparity among defendants with similar records who have been found guilty of similar conduct.  *Id.* at § 3553(a)(6).  In addition, as the court was informed at the time of the presentence conference, Donna and Hope are prepared to make restitution in the amount of $900,000, the entire amount of underpayment left in the D & H account after the "loans" demanded by Dominguez were taken.[8]  *Id.* at 3553(a) (7) (directing sentencing courts to consider the need to provide restitution to any victims of the offense).

### Donna and Hope are Good and Decent People Deserving of Leniency

Attached as exhibits are letters from people who have known Donna and Hope throughout their lives.[9]  These letters provide substantial insight into their character and attest to their integrity and moral soundness.  Together, these letters paint a picture of honest, generous, hard-working, and widely admired women who are worthy of this court's leniency.

- **Donna Venturini**

John Venturini is Donna's son.  He is a graduate of Penn State University, with a

---

[7]We submit that the need for educational or vocational training, medical care, or other correctional treatment are not issues in this case.  Id. at § 3553(a)(2)(D).

[8] Counsel for Donna and Hope came to the presentence conference with a check for $900,000 to be applied toward restitution.  Given that there is not yet a restitution judgment, the government asked that the check not yet be provided.  Donna and Hope are ready to pay that amount whenever requested.

[9] These letters are addressed to Judge Conner since they were written prior to the case being transferred to this court.

degree in Statistical and Mathematical Science.  Mr. Venturini considers his mother to be his "best friend," his "sounding board," his "course corrector," and his "guidance." According to Mr. Venturini, Donna pretty much raised him by herself.

> She made sure I met my obligations, went to school and succeeded in my studies and socially, while providing single-handedly for our family. . . . She taught me very important facets to life. She taught me the importance of respecting one's elders, one's community, one's family and one's friends. She taught me the sanctity for respect towards women and to our respected officials and institutions. She taught me the validity and hallmark of a strong work ethic and to always believe that anything worthwhile and noble is possible if you work hard for it and you put your mind to it.

Mr. Venturini considers his mother to be "the fairest and most honest and trustworthy person" he knows.  She "will take the shirt off of her back for anyone."   "She has such a tremendous personality with such a tremendous heart."  Mr. Venturini asks the court to be lenient with his mother.  See letter from John Venturini, attached hereto as Exhibit "1."

Christina Venturini is Donna's daughter-in-law.  She has known Donna for 15 years.   "Through these years, she has proven herself time and again to be a caring, trusted and revered member of our family."  According to Mrs. Venturini, Donna has been "a loving mother and friend, and a trusted advisor through all of life's joys and challenges." Mrs. Venturini is inspired by Donna's commitment to her family and her community.

> She's a valued member of her community, and an upstanding member of her church. In fact, she dedicates her time and personal resources to make meals for the Priest of St. Luke's parish in Stroudsburg, because she is uniquely knowledgeable to cook for his dietary needs, and wants to help him bring his best to the church family week after week. Nothing better

demonstrates more how Donna constantly gives of herself to those she loves.

Mrs. Venturini knows Donna "to be an honest and fair person, who does not intend to mislead or intentionally hurt anyone." She asks the court to be lenient with her mother-in-law.  See letter from Christina Venturini, attached hereto as Exhibit "2."

Reverend Carmen J. Perry is the pastor of St. Luke's Parish, where Donna Venturini is a member. He has known Donna and her sisters for years. Reverend Perry knows Donna "as a very giving and generous person. She is a faithful member of the church, and I have no reason to doubt her fairness or honesty. I don't believe she would intentionally hurt or mislead anyone." According to Reverend Perry, Donna is a volunteer on one of the Parish's Soup Kitchen teams, which serves a meal each Saturday to the poor and homeless. In addition, Donna – who is a good cook – prepares a meal for Reverend Perry, and often the Parish office staff, each Wednesday. Reverend Perry considers Donna to be "a very giving and generous person." "I don't believe she would intentionally hurt or mislead anyone." Rather, "I believe she and her sisters sensitivity and generosity make them vulnerable to being hurt." Reverend Perry asks the court to "be as lenient as possible with Donna." See letter from Reverend Carmen J. Perry, attached hereto as Exhibit "3."

Rosa Weiner has known Donna for 18 years and considers her to be her "dearest friend" and "part of [Donna's] family." According to Ms. Weiner, Donna "is a very religious person who attends church and volunteers and helps others in the area, as well as a wonderful mother to her son John." Ms. Weiner can vouch for Donna's "honesty and integrity." According to Ms. Weiner, Donna "is an all around wonderful person and does not deserve what she is going through." Ms. Weiner requests leniency on her friend's behalf. See letter from Rosa Weiner, attached hereto as Exhibit "4."

Michael Weiner has known Donna for 18 years. In fact, he was employed by Donna as a salesman. He has "always found her honorable and trustworthy." "I have visited Donna over many Christmas dinners over the years, and have always been welcome into her home, and always made like I was part of the family." According to Mr. Weiner, Donna is a

"terrific women, fun loving, knowledgeable, and always there for you. I call her my friend as many other people feel about her."  See letter from Michael Weiner, attached hereto as Exhibit "5."

Bernadette Arslanian is Donna's older sister. They are as close as sisters can be, "We grew up in a home where there were a lot of problems. My dad drank a lot and my mom was always the recipient of his anger."  The family "didn't have much, but we had each other and always made the best of our situation. Donna was always happy and went out of her way to make situations easier at home for us."  According to Mrs. Arslanian, during those years, Donna was "so strong and giving of herself." After Donna married,

> [S]he brought her son up to respect his elders, work hard, be honest and above all be there to help others.  Donna made sure John would have the best education and sent him to Penn State, Main Campus, and did this all on her own. My nephew John turned out to be a wonderful adult, thanks to his mom.

Mrs. Arslanian and Donna have worked together most of their lives.  Donna "always gave 100% of herself. At work, she would always listen to the workers, offering them a helping hand," and even cooking for some of them.

Mrs. Arslanian discusses Donna's medical issues.  "Every day is a struggle for her and meeting her you would never know it."  Mrs. Arslanian's husband died of cancer some years back.  "When my husband got sick, it was Donna who helped me get through the worse time of my life. She took over, made the decisions, as I was totally unable to do anything." Mrs. Arslanian ends her letter by informing the court that "Donna is the most giving, caring, honest person . . . . I hope that you will be as lenient as possible as she stands before you."  See letter from Bernadette Arslanian, attached hereto as Exhibit "6."

Marie Platten has known Donna for approximately seven years.  She considers

herself a good friend of Donna's and her sister, Bernadette.  Based on her friendship with Donna, Ms. Platten believes her to be "a fair and honest person who, in my personal opinion, would never, or could ever, intend to mislead or intentionally hurt anyone." According to Ms. Platten, the following list of adjectives are descriptive of Donna: "She is a person who is humble, sincere, affectionate, warm-hearted, honest, companionate, ambitious, faithful, diligent, loyal, patient, generous, emotional, conscientious, thoughtful and amicable."  Based on those attributes, "I honestly feel Donna deserves a little leniency regarding her matter."  See letter from Marie Platten, attached hereto as Exhibit "7."

Deborah Boyle has been Donna's CPA for corporate and individual tax matters for nine years.  During that time, "I have seen nothing but helpfulness and an intention to do the right thing regarding financial transactions as well as interpersonal matters."  Ms. Boyle has always "found Donna to be a fair and honest person. Certainly I have never known her to mislead or to intentionally hurt anyone. I would count on her for help if it was needed. She is also active in her church community and volunteers her time and energy."  Ms. Boyle addresses the court: "Donna truly deserves as much consideration for leniency as possible."  See letter from Deborah E. Boyle, attached hereto as Exhibit "8."

- **Hope Carbone**

John Venturini is Hope Carbone's nephew (Donna Venturini's son).  He has known Hope all of his life.  According to Mr. Venturini, Hope "was a very influential part of my upbringing."  "She taught me the value of a hard work ethic and made sure I also had that can-do attitude in anything I did academically or professionally."   Mr. Venturini relates how both Hope and his mom work to "take care of their community, their friends, their family and each other."  According to Mr. Venturini:

My aunt is a very special person. She is appreciated in her community and will give anything for anyone in need. She personifies the hallmarks of respect, honesty, modesty and reliability. Hope Carbone is a hard-working, selfless and caring woman who I am proud to call my aunt.

Mr. Venturini ends his letter to the court as follows: "I am very grateful for you reading my letter and would be very grateful for any consideration you may give in her leniency." See letter from John Venturini, attached hereto as Exhibit "9."

Christina Venturini is John's Venturini's wife and Hope's niece. She has known Hope for 15 years. According to Mrs. Venturini, "Through these years, [Hope] has proven herself time and again to be a caring, trusted and revered member of our family and her community." Mrs. Venturini goes on to state:

Hope is, without question, the most trustworthy and honest person I know. She believes in the strength of family and the power of Faith. Hope is forthright and true to her word. She is selfless and has been a trusted friend and advisor through all of life's joys and challenges.

Mrs. Venturini asks for the court's leniency when sentencing her aunt. See letter from Christina Venturini, attached hereto as Exhibit "10."

The Reverend Carmen Perry, who wrote to the court on Donna's behalf (supra), wrote in a similar vein on Hope's behalf. He knows Hope and her sisters well since they all attend Mass regularly. He thinks highly of Hope and her sisters. He asks for leniency from the court on Hope's behalf. See letter from Reverend Carmen J. Perry, attached hereto as Exhibit "11."

Rosa Weiner, who wrote to the court on Donna's behalf, also writes a letter supporting Hope, who she knows equally well. According to Ms. Weiner, Hope "is a very religious person who attends church and volunteers and helps others in the area. She is one of the most generous persons I know." Ms. Weiner vouches for Hope's honesty and

integrity and requests leniency from the court.  See letter from Rosa Weiner, attached hereto as Exhibit "12."

See also letter from Michael Weiner, attached hereto as Exhibit "13."

Bernadette Arslanian, Hope's older sister, writes on her behalf.  As in the letter supporting Donna, Mrs. Arslanian relates the sisters' difficult younger years with an abusive, alcoholic father.  "My sister Hope became very protective when it came to us and never allowed anyone, or anything to hurt us."  Mrs. Arslanian goes on to describe Hope's work ethic and selfless nature.  Being the only unmarried sister, Hope was the one who lived with and cared for their ill mother until she passed.  In addition,  "When I was losing my husband to cancer, [Hope] sat at his bedside for the entire week, just holding his hand until he passed. I thank God for her being here with me, she was a huge comfort and took care of all the little things that I never thought of."  Mrs. Arslanian knows Hope to be an "honest, caring and compassionate" person and asks the court to be lenient when sentencing her.  See letter from Bernadette Arslanian, attached hereto as Exhibit "14."

Marie Platten and Deborah Boyle, who wrote to the court in support of Donna, wrote on Hope's behalf as well.  They both request leniency for their friend.  See letters from Marie Platten and Deborah Boyle, attached hereto as Exhibits "15" and "16."

## Conclusion

Given the circumstances of the offense, the anticipated 5K1.1 downward departure motion, the Section 3553 (a) factors discussed above, and Donna's and Hope's blemish free personal history, there simply is no need for the Court to incarcerate them.   We submit that neither Donna nor Hope is in need of the federal prison system and the federal prison system most certainly is not in need of Donna and Hope. We recommend that the court

downward depart and/or vary downward to an offense level that will allow for a probationary sentence, with a condition that includes a period of home confinement.   Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of the law.

Respectfully submitted,

RASKIN & RASKIN, P.A.
201 Alhambra Circle
Suite 1050
Coral Gables, Fl.  33134
Telephone: (305) 444-3400

/s/  Martin R. Raskin
Martin R. Raskin, Esq.
Florida Bar No. 305206
mraskin@raskinlaw.com

By: /s/ Barry M. Boren_____
Barry M. Boren, Esq. Fla. Bar 247286
LAW OFFICES OF BARRY M. BOREN
9100 S. Dadeland Blvd., Suite 402
Miami FL 33156
(305) 670-2200 fax: (305) 670-5221
E-mail barry@bboren.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 7th, 2018, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

/s/  Martin R. Raskin
MARTIN R. RASKIN